**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **UNITED STATES** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:26-cr-107-LMB** |
| | ) | |
| **CARY ANDRE RUE,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Cary Andre Rue, by and through undersigned counsel, respectfully submits this Memorandum in Aid of Sentencing. Mr. Rue comes before the Court after having accepted responsibility to Count Two of the Indictment, advertisement of child sexual abuse material in violation of 18 U.S.C. § 2251(d) and (e), and Count Six, possession of child sexual abuse material in violation of 18 U.S.C. § 2252(a)(4)(B) and (b)(2). PSR ¶ 4. Mr. Rue's conduct in this case is extremely serious and he does not come before the Court to explain away what he did. He collected, traded, and talked about images of children being sexually abused. *See generally* Statement of Facts (Dkt. No. 33). He did it on encrypted platforms, in groups built for that purpose, and he wrote things in those groups that are difficult to read that he will carry for the rest of his life. *Id.*

The question for the Court is not whether this conduct deserves a severe sentence. It does, and Congress has already guaranteed one. The question is whether anything beyond fifteen years is necessary to serve the purposes of sentencing for a 56-year-old man with no criminal history, whose risk of reoffending is low based on the assessment of a forensic psychologist, and who will live under federal supervision, monitoring, and sex-offender registration for as long as the Court

directs. For reasons stated below, Mr. Rue respectfully submits that the mandatory minimum sentence of 180 months is "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a).

## I. THE LEGAL FRAMEWORK

The Court must begin by correctly calculating the advisory Guidelines range, but it may not treat that range as mandatory or presumptive. *Gall v. United States*, 552 U.S. 38, 49-51 (2007); *Nelson v. United States*, 555 U.S. 350, 352 (2009). The Court must then consider all of the factors in 18 U.S.C. § 3553(a) and "make an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 49-50. The Court's overarching duty is to "impose a sentence sufficient, but not greater than necessary," to accomplish the purposes of sentencing. *Kimbrough v. United States*, 552 U.S. 85, 101 (2007); see 18 U.S.C. § 3553(a).

Section 3553(a)(1) commands consideration of "the nature and circumstances of the offense and the history and characteristics of the defendant," because "the punishment should fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487-88 (2011) (internal quotation marks omitted). Congress has directed that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider" at sentencing. 18 U.S.C. § 3661. As the Supreme Court has stated, it "has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996).

## II. THE ADVISORY GUIDELINES RANGE

The parties stipulated to, and the PSR adopts, the following calculation under U.S.S.G. § 2G2.2. PSR ¶¶ 5, 71–84.

| | | |
|---|---|---|
| § 2G2.2(a)(2) | Base offense level | 22 |
| § 2G2.2(b)(2) | Material involving a prepubescent minor or minor under 12 | +2 |
| § 2G2.2(b)(3)(C) | Distribution to a minor | +5 |
| § 2G2.2(b)(4) | Sadistic or masochistic conduct, or abuse of an infant or toddler | +4 |
| § 2G2.2(b)(6) | Use of a computer or interactive computer service | +2 |
| § 2G2.2(b)(7)(D) | 600 or more images | +5 |
| | Adjusted offense level | 40 |
| § 3E1.1(a), (b) | Acceptance of responsibility | −3 |
| | **Total offense level** | **37** |

With zero criminal history points and Criminal History Category I, the advisory range is 210 to 262 months. PSR ¶¶ 87–88, 123. The statutory minimum on Count Two is 180 months. Mr. Rue therefore asks for a sentence 30 months below the bottom of the range.

## III. 18 U.S.C. § 3553(a) FACTORS

### A. Nature and Circumstances of the Offense

The Statement of Facts speaks for itself. It is no doubt very serious and the language contained therein is extremely strong and disturbing. None of what follows is offered to diminish that. Every file in Mr. Rue's collection represents the abuse of a real child, and the trade in that material revictimizes those children every time it is passed along. Mr. Rue understands that, and he understands that the groups he joined existed to keep that material moving. He is not asking the Court to treat this as a victimless offense or a lapse in judgment. He is asking the Court to sentence him for what he did, at the floor Congress has set for it.

In his letter to the Court, Mr. Rue humbly writes that he is "sorry for what [he] has done not because [he] was caught or because of the penalties but because [he's] a good person that knows right from wrong." *See* Exhibit A. Without excusing his conduct, Mr. Rue goes on to provide context to the triggers that led him to the conduct in this case. *Id*. He further writes "I understand that victims can be re-traumatized when they become aware of people viewing their past abuse … I am sorry for any harm this caused." *Id*. Mr. Rue seemingly wanted to get caught because it really forced him to delve deep into his own psyche and realize that he was never really ok from a mental health perspective, and he is surprised he was actually able to function as a relatively normal adult. *Id*. He knows he will "come out better" because "incarceration ripped open all of the emotional scars [he] has," and he is finally "dealing with [his] problems." *Id*. Mr. Rue plans to be productive while in prison and his only hope is to have some years left with his family upon release. *Id*.

The mandatory minimum sentence in this case comes from Count Two, the advertisement count. The conduct underlying that count is specific. On November 4, 2025, another user posted a video in a Session group chat in which Mr. Rue was a participant. Mr. Rue replied: "Love this!!! Need more." PSR ¶ 43. The Statement of Facts describes this as the occasion on which Mr. Rue "knowingly posted a notice seeking to receive CSAM." PSR ¶ 41. Mr. Rue pleaded guilty to that offense, and he does not suggest that the reply falls outside § 2251(d).

However, the Court is entitled to consider where this conduct sits within the range of conduct Congress had in mind when it attached a fifteen-year floor to advertising. Section 2251(d) reaches the person who publishes a notice to the world offering to produce, trade, or distribute child sexual abuse material. Mr. Rue typed four words in reply to another user's post inside an

invitation-only encrypted group. Respectfully, this conduct is on the low end of the spectrum of culpability that triggers the fifteen year mandatory minimum on an advertising count.

The Guidelines do not draw that distinction. An advertisement conviction under § 2251(d) is sentenced under the same guideline, § 2G2.2, and from the same base offense level of 22, as ordinary receipt or distribution. PSR ¶ 71. The 210-to-262-month range is therefore not the product of anything unique to advertisement. It is driven entirely by the specific offense characteristics discussed below, most of which, through the Commission's own findings, apply in nearly every case.

The other crucial question for the Court to consider is one of fantasy. Mr. Rue admits that he made the statements contained in the Statement of Facts, particularly as it relates to his conduct and desires, but he does not admit that he ever actually harmed a child in any manner whatsoever. The record does not establish any of those claimed events happened. Importantly, the government had every opportunity to investigate these claims and has not alleged that any of them is true. The FBI seized approximately 25 devices from Mr. Rue's home and person and had access to his cloud accounts and messaging history. PSR ¶ 23. With all of that in hand, the government has found no evidence that Mr. Rue ever actually took actionable steps toward or actually did any of the acts mentioned in the Statement of Facts. Further, the statements carry the hallmarks of an online persona rather than a factual account. In one exchange quoted in the Statement of Facts, Mr. Rue told the other user he was 48 years old; he was 55. PSR ¶ 54. Other messages describe fantastical scenarios, such as kidnapping entire families, that no one suggests he ever planned or attempted. PSR ¶¶ 46, 50. The participants in these groups were anonymous, used encrypted applications designed to avoid identification, and traded escalating claims as a form of social currency. [redacted]

[redacted]

None of this makes the messages acceptable, and Mr. Rue does not ask the Court to disregard them. They are part of the offense and reflect a profound loss of moral bearings, but there is a meaningful difference between a man who said terrible things in a degraded online community and a man who has physically abused children. The record supports only the former. Adding years to the statutory minimum on the theory that Mr. Rue is the latter would punish him for conduct the government has not charged, has not alleged, and has not proven.

Mr. Rue lived his entire life without committing a criminal offense, and in fact, earned his Ph. D. and is considered a high achiever in many respects. The offense conduct did not begin in adolescence or early adulthood, and it did not occur in a vacuum. It began, according to the Statement of Facts, "at least in November 2023." PSR ¶ 36. The timing is not a coincidence. Mr. Rue's father, the parent he described as the stable center of his childhood, died on February 14, 2023, after approximately seven years of decline from ALS. *See* Exhibit D. Additionally, Mr. Rue had stopped coaching his son's baseball team in 2022, removing what his wife describes as a primary source of structure and connection in his life. *See* Exhibit C. His only child left for college in the late summer of 2024. *Id.* His drinking, by his own account, rose to four to eight drinks a day beginning in 2023. PSR ¶ 110.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

**C. Mr. Rue's History and Characteristics**

Mr. Rue was adopted at birth. His adoptive parents separated when he was an infant, and he lived with his mother until she sent him, at about age five, to live with his father and a new stepmother. PSR ¶¶ 93–94. In that household, he slept on a mattress in the living room. PSR ¶ 95. His stepmother treated him differently from her own children, was openly critical of his mother, and asked him why he still loved her. PSR ¶¶ 95, 108. Reflecting on those years, Mr. Rue told Dr. Keller: "by seven years old, I had lost three mothers: my birth mother, adoptive mother, and then my stepmother." *Id*. at 7.

[redacted]

[redacted]

[redacted]

Despite that start, Mr. Rue built a life of real accomplishment. He earned two bachelor's degrees from Louisiana State University and a Ph.D. in microbiology from the University of Tennessee in 2001. PSR ¶ 112. After a postdoctoral fellowship at Oregon Health Sciences University and four years as a research microbiologist with the U.S. Department of Agriculture, he joined the FBI in 2010. PSR ¶¶ 113–15. He spent the next sixteen years responding to biological threats, rising to supervisory microbiologist and holding a Top Secret clearance. PSR ¶¶ 19, 113. His wife describes a career in which he was frequently on call and "put himself in harm's way many times . . . to search for evidence in biologically hazardous environments." *See* Exhibit C. He taught microbiology at the community-college level and trained colleagues and foreign counterparts on recognizing and reducing biological risks. *See* Exhibits B, D, and E. Mr. Rue was of course terminated as a result of this offense, and his career is now over. PSR ¶ 113.

The letters submitted on Mr. Rue's behalf come from people who know what he has pleaded guilty to and wrote anyway. They describe a man whose care for others was consistent and concrete. *See* Exhibits C-L.

When his father's ALS left him nearly unable to move, and his stepsister in Louisiana was overwhelmed by caring for both parents, Mr. Rue took over coordinating his father's care from Virginia. *See* Exhibit D. When his father was evacuated because of a hurricane and needed to get home, Mr. Rue flew to Texas and drove him back himself. *Id.* His stepsister, Rhonda Bonsignore, writes that she is "horrified by his actions" and "recognize[s] the suffering of the children depicted," and still asks for leniency because, "[w]hen I called, he responded with sustained action." *Id.* Mr. Rue was at his father's side during his last days. *See* Exhibit C.

Mr. Rue's wife of 27 years, Dr. Joanne Rue, a veterinarian, describes how he supported her financially and emotionally through veterinary school, commuting every weekend between Virginia and Georgia for a year so she could finish her degree. *Id*. She writes that he is "extremely remorseful for the hurt and suffering that he has caused his family, his friends and the victims," and that she remains supportive. *Id.*

His son, Hayden, now a third-year biomedical engineering student at the University of Virginia, writes with notable honesty. He acknowledges "feelings of confusion, disappointment, and anger," and states that his letter "is not intended to excuse or minimize my dad's actions." *See* Exhibit F. He describes a father who spent countless hours with him, who consoled him lying on the turf of a batting cage after a bad practice, and who taught him to own his mistakes. *Id.* He believes his father "feels immense remorse for his actions, both for the harm caused to children and for how his conduct will affect my life and my mom's life perpetually." *Id.* Mr. Rue's mother, Amory Phelps, and his aunt, Jan Spelbrink, write heartfelt letters that describe a compassionate

and intelligent man, and notes that Mr. Rue has asked for, and received, their forgiveness, and that they will remain in his life. *See* Exhibits G and H.

Robert Merrill has known Mr. Rue since second grade. They were college roommates and have stayed close for nearly fifty years. *See* Exhibit E. Mr. Merrill, who is aware of the charges, describes a friend who was the only person from home to attend his wedding, who called with "sincere condolences and sorrow" when his mother died, and who "is a learner" who will use whatever time he has in prison to "make himself better, and make others better as well." *Id.*

Several families from the Stafford baseball community also wrote. For roughly a decade, Mr. Rue volunteered as a Little League and travel baseball coach, served on the board of his son's high school baseball program, and helped several players reach college programs. *See* Exhibits I and J. Two of those former players, now young adults, wrote on their own. *See* Exhibits K and L. Mr. Rue offers these letters with care. He does not suggest that his coaching bears on the risk the Court must assess, and he recognizes that his conditions of supervision will appropriately restrict contact with minors. He offers them because they reflect how he lived the overwhelming majority of his life, and because the parents who entrusted their sons to him for years chose to write to this Court after learning what he had done.

Mr. Rue's remorse is not performative. [redacted]

Mr. Rue has otherwise lived an unblemished life, and the letters of support show the kind, caring, intelligent, and hardworking man Mr. Rue has always been.

**D. Mr. Rue's Likelihood of Recidivism is Low**

Of all the purposes of sentencing, the need to protect the public from further crimes of the defendant is one of great practical concern and is the most capable of being measured. Fortunately, Mr. Rue does not fit the archetype of a person who will commit new criminal offenses or recidivate. And because of the reinvigorated role of the judiciary in sentencing, judges can now impose sentences that take such research into consideration to more effectively impose sufficient, but not greater than necessary, sentences.

The judiciary's bolstered role is especially important given the Commission's own findings that "there is no correlation between recidivism and Guidelines' offense level. Whether an offender has a low or high guideline offense level, recidivism rates are similar. While surprising at first glance, this finding should be expected as the Guidelines' offense level has long been recognized as not intended or designed to predict recidivism." *U.S. Sentencing Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 15 (May 2004) (hereinafter *Measuring Recidivism*). Thus, the guidelines are at odds with 18 U.S.C. § 3553(a)(2)(C). Accordingly, *Booker* has freed the judiciary to remedy this inconsistency.

In addition to what has already been described about Mr. Rue's character demonstrating his ability to reform, the Commission has also objectively quantified his low likelihood of recidivism. For example, the Sentencing Commission's study confirms that recidivism rates decline relatively consistently as age increases. *See Measuring Recidivism* at 12. More specifically with respect to Mr. Rue, who is 56 years old and a criminal history category of I

have a recidivism rate of only 6.2 %. *Id.* at 28. Similarly, those offenders who are college graduates and are married, have a recidivism rate of only 7.1% and 9.8% respectively. It is unfortunate that the Guidelines' offense levels do not take into consideration such data. This data exists yet is not utilized to inform the Commission's rulemaking.

### E. Mr. Rue's Public Demise is Adequate Deterrence to Others

Section 3553(a)(2)(B) requires the Court to consider "the need for the sentence imposed to afford adequate deterrence to criminal conduct." The government already substantially achieved the maximal deterrent effect of Mr. Rue's offense by charging and obtaining a conviction that carries a fifteen year mandatory minimum term of imprisonment. Further, as a result, Mr. Rue's name and the substance of his offense, including being on the sex offender registry, will be discussed in numerous conversations and settings among family, friends, and the community for years to come, a shameful reality from which he simply cannot escape. In short, Mr. Rue's public demise sends a strong message to anyone foolish enough to engage in similar offenses. More than the mandatory minimum is simply not necessary in this case.

## IV. GUIDELINES POLICY CONSIDERATIONS

Courts may vary from a guideline that does not reflect "the Commission's exercise of its characteristic institutional role" of basing guidelines on empirical data and national experience. *Kimbrough*, 552 U.S. 87, 109 (2007). Section 2G2.2 is such a guideline. Many of its features were mandated by congressional directive rather than developed by the Commission, and the Commission itself has repeatedly told Congress that the guideline no longer distinguishes among offenders. See U.S. Sent'g Comm'n, *Report to the Congress: Federal Child Pornography Offenses* (Dec. 2012); U.S. Sent'g Comm'n, *Federal Sentencing of Child Pornography: Non-Production Offenses* (June 2021) ("2021 Report"). As Courts have noted, "[I]t is difficult for a sentencing

judge to place much stock in a guidelines range that does not provide realistic guidance," *United States v. Parris*, 573 F. Supp. 2d 744, 751 (E.D.N.Y. 2008). As the Sixth Circuit has recognized, enhancements that apply in "almost every case" are contrary to the purpose of enhancements, which "are meant to increase a sentence for conduct more aggravated than the typical type of offense." *United States v. Robinson*, 669 F.3d 767, 778 (6th Cir. 2012).

The Commission's 2021 findings are stark. Four of the six enhancements that account for a combined 13 offense levels, cover conduct that has become so ubiquitous that they now apply in the vast majority of cases sentenced under §2G2.2. *See* 2021 Report at 5. In fiscal year 2019, more than 95 percent of non-production offenders received the enhancements for use of a computer and for material depicting a child under 12; 84.0 percent received the enhancement for sadistic or masochistic conduct or abuse of an infant or toddler; and 77.2 percent received the enhancement for 600 or more images. *Id.* at 5, 19. The Commission concluded that "§2G2.2 fails to distinguish adequately between more and less severe offenders." *Id.* at 19. Judges have responded accordingly: in fiscal year 2019, only 30.0 percent of non-production offenders were sentenced within the range, and 59.0 percent received a below-range variance. *Id.* at 6.

Those same four enhancements account for 13 of the 18 offense levels added to Mr. Rue's base offense level. PSR ¶¶ 72, 74–76. They do not distinguish him from the typical offender; they describe the typical offender. Setting them aside, Mr. Rue's offense level would be 24 after acceptance, with an advisory range of 51 to 63 months. The statutory minimum of 180 months is roughly three times that figure. In other words, the mandatory minimum already accounts, many times over, for everything about this offense that distinguishes it from the ordinary case. The additional 30 to 82 months the Guidelines would layer on top come almost entirely from

enhancements the Commission itself has found fail to separate more culpable offenders from less culpable ones.

In sum, the guidelines under USSG § 2G2.2 have become divorced from their stated purpose. Time and again, Congress and the Commission relied on mistaken beliefs to increase the guidelines. The result is a guideline that is so disconnected from current evidence and the national experience that most judges find even the lower guideline unduly harsh and inconsistent with the statutory purpose of § 3553.

## V. CONCLUSION

Mr. Rue has destroyed the life he built, and he did it by joining in the exploitation of children who had already suffered more than anyone should. He knows that, and he will spend a very long time in prison because of it. A sentence of fifteen years, followed by supervision for as long as the Court deems necessary, punishes that conduct severely, protects the public, provides the treatment Mr. Rue needs, and allows him to begin repaying the victims while he is still able to work. For a 56-year-old man with no prior record, it is sufficient. Cary Rue respectfully asks the Court to impose it.

Respectfully submitted,

_________/s/__________________
David Benowitz, VSB # 91194
Rammy G. Barbari, VSB # 88414
Price Benowitz LLP
409 7th Street, NW, Suite 200
Washington, DC 20004
Tel: (202) 271-5249
Tel: (202) 870-0139
david@pricebenowitz.com
rammy@pricebenowitz.com
*Counsel for Cary Andre Rue*

**CERTIFICATE OF SERVICE**

I hereby certify that on 9th day of November 2026, a copy of the foregoing Memorandum in Aid of Sentencing was served via the CM/ECF on all parties.

_________/s/_________________
David Benowitz