IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CARY ANDRE RUE,<br><br>*Defendant*. | Case No. 1:26-CR-107 (LMB)<br><br>Sentencing: November 17, 2026 |

**POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING**

For the last several years, the defendant has led two separate lives. Outwardly, the defendant was a married father and career employee at the Federal Bureau of Investigation (FBI), supervising employees in the Operational Microbiology Program. Secretly, however, the defendant spent numerous hours on encrypted messaging platforms chatting with, and whetting the appetites of, individuals interested in the sexual abuse of children and trafficking images and videos of children being abused and raped. The defendant also secretly harbored, and frequently discussed online with like-minded individuals, a specific interest in sexual violence, engaging in graphic conversations about how he would kidnap, rape, and murder particular people, including the 14-year-old ex-girlfriend of a family member. Shortly before his arrest, the defendant photographed young girls walking to school while he sat inside his FBI-issued vehicle.

The defendant now comes before the Court for sentencing after having pleaded guilty to one count of advertising child sexual abuse material (CSAM), in violation of 18 U.S.C. § 2251(d) and (e), and one count of possession of CSAM, in violation of 18 U.S.C. § 2252(a)(4)(B) and (b)(2). The applicable Guidelines range has been correctly calculated in the

Presentence Report ("PSR") as 210 - 262 months' imprisonment. *See* Dkt. 36 ("PSR") at ¶123. For the reasons below, the United States respectfully recommends the Court impose a sentence of 262 months, which is sufficient but not greater than necessary to reflect the totality of the defendant's conduct and comport with the purposes of sentencing set forth in 18 U.S.C. § 3553.

## BACKGROUND

### I. Factual Background[1]

In September 2025, the National Center for Missing and Exploited Children (NCMEC) received multiple CyberTipline Reports related to images and videos the defendant, then an FBI supervisor, had uploaded to his Google Drive account. The images and videos included depictions of very young children engaged in sexually explicit conduct, including, for example, prepubescent children performing oral sex on adults.

On April 8, 2026, the FBI executed multiple federal search warrants for the defendant's electronics devices. While one team of FBI agents searched the defendant's residence in Stafford, a second team searched the defendant's person at a training site on Marine Corps Base Quantico and seized his Samsung cell phone. Forensic review of the defendant's cell phone ultimately revealed thousands of images and videos of minors, some as young as infants, being sexually abused, raped, and tortured. And while the defendant's CSAM collection depicted a range of ages, and both boys and girls, he professed a particular interest in rape, sexual violence, and bestiality.

[1] The factual background of this case is set forth in detail in the PSR and Statement of Facts and is incorporated herein by reference. *See* PSR ¶¶ 19-59. As such, the facts and procedural history are summarized here only in relevant part.

**A. The Defendant Trafficked CSAM in Encrypted Messaging Applications**

The defendant used multiple Internet-based, encrypted, messaging applications, including Telegram and Session, to receive and distribute CSAM, including depictions of sexual violence and bestiality. For example, on March 3, 2026, the defendant sent a message to a user on Session saying, "Ok. Well, lmk when u wanna goon[2] together to violence." The defendant then sent the user several videos depicting violent sexual encounters, some of which depicted minors engaged in sexually explicit conduct, including a 2-minute video with an MD5 hash value ending in "075EB59B." This video depicts a girl who appears to be in the early stages of puberty. During the video, the girl is shown bound and gagged, while another individual pulls her to her knees by her hair, and she simulates oral sex on a black dildo. Later, the other individual in the video is shown exposing the girl's vagina and inserting something into her anus while the dildo is still in the girl's mouth.

On February 1, 2026, the defendant sent eight videos to a Session user who purported to be 16 years old. Six of the eight videos depicted minors engaged in sexual acts with animals.

The defendant also participated in multiple group chats on Session. In these group chats, which were designed to facilitate the trafficking of CSAM and discussion of the participants' shared sexual interest in children, the defendant received CSAM, distributed CSAM, and knowingly posted a notice seeking to receive CSAM.

In one group chat with roughly 200 participants, users asked other participants for content depicting, for example, "todd or baby" (i.e., CSAM depicting toddlers or babies), "baby cunt being stretched," "baby anal," and "bad babysitter." When a user asked if anyone had "cp zoo," (i.e., child pornography containing bestiality) the defendant replied, "Lots. But valuable stuff."

[2] "Goon" means to masturbate together while talking about it.

On October 29, 2025, a user posted a 1-minute and 15-second compilation video depicting, among other things, a prepubescent girl performing oral sex on an adult man and an adult man anally penetrating a prepubescent girl with his penis.[3] Two minutes later, the defendant replied to the post, saying, "My fav evr[.]" Later that same day, the defendant posted in the group chat a video of a minor girl performing oral sex on what appears to be an adult man.

On November 4, 2025, a Session user posted a video in the Session group chat. The 10-second video, which has an MD5 hash ending in "b57760c," depicts a girl performing oral sex on a minor boy. The defendant posted a reply to this post/video, stating, "Love this!!! Need more[.]" Approximately 20 seconds after his first post, the same user posted another video of a girl and minor boy engaged in oral sex. The defendant replied, "Love that 13yo cock . . ." This user had also posted CSAM in the group chat prior to November 4, 2025, including a video he posted on October 30, 2025, depicting a man masturbate over and ejaculate on a sleeping child. On December 11, 2025, the defendant wrote, "Anyone know where to get dark stuff? For$$"

The defendant also encouraged a purported teacher to take and send pictures of his students. On March 29, 2026, the defendant chatted on Session with a user who purportedly worked at an elementary school. The user told the defendant, "its so arousing to be around teens[.]" The defendant responded, "If u can show me real pics I'll love you forever)) [.]" The other user asked, "Real pics?" "I can send u teen vids[.]" The defendant responded, "Real pics are best." "But anything is great." "I have tons to share too)) [.]"

---

[3] According to NCMEC's Child Identification Report for this case, this video depicts at least 4 different identified minors.

**B. The Defendant Is Obsessed with Rape and Depictions of Sexual Violence**

The defendant used encrypted messaging applications to share his violent sexual fantasies of kidnapping, rape, and torture. On October 6, 2025, the defendant told a user online his favorite material was “teens, rape, teen rape, pre-teen, preteen rape[.]” On November 11, 2025, the defendant chatted with another user on Session about raping a woman in Texas. The other user posted a picture of a woman with the words “Rape her” and an address in Texas. The defendant told the user:

- “Oh, id rape her”
- “I’ve done it a lot of times. Easy to get away w if you know what you’re doing”
- “I’m talking about not being seen by anyone or cameras”

On December 2, 2025, the defendant chatted with a user about the defendant’s fantasy of kidnapping a family and raping the children in front of the parents. The Session user asked the defendant about his “Favorite fantasy or taboo kinks?” The defendant responded:

- “So many…want to kidnap kids families…make them watch me ruin their daughter…then the son…then the mom…then the dad”
- “Make them watch me fuk the dad in the ass…and then he calls cleans my fat cock”
- “Then I beat the shit out of him”

On January 30, 2026, the defendant told another Session user, “I want to rape a downs girl in front of her parents[.]” On February 5, 2026, the defendant chatted with another user on Telegram regarding the 14-year-old ex-girlfriend of the defendant’s family member. The defendant sent the user a picture of the girl, and told the user, “I want to break into her house after prom night…fuk her ass as I strangle her[.]” The defendant then sent another picture of a minor girl, saying, “Another [family member redacted]’s ex. A slutty 14 y.o. here. Wanted to gangbang her w friends. Beat the shit out of her and cum on her wounds[.]”

Two days later, the defendant told a user on Session that he wanted to "hurt her so bad" in a conversation about his family member's 14-year-old ex-girlfriend. When the other user asked the defendant how he wanted to hurt her, the defendant responded:

- "Donkey punches, definitely"
- "Fuk her pussy doggy and Fist her ass."
- "Then take her doggy, grab her hair…drown her in toilet"

The other user asked, "Snuff?[4]" and the defendant responded:

- "I want to so bad"
- "Keep fuking her"
- "Invite friends to fuk her dead ass"

Later the same day, the defendant told a user on Session that his "best fantasy is to kidnap a family" "Fuk everyone while others watch" "Then some die[.]" The defendant said "I want to fuk [the dad's] ass and cum in his face for his children to see" "Then he can go[.]" Approximately 90 minutes later, the defendant offered another Session user to rape the user's mother. When the user told the defendant where his mother worked, the defendant asked, "U want to watch or participate?"

On March 3, 2026, the defendant told a user on Session, "I want an epstein island But id go younger." On November 23, 2025, the defendant said in a chat on Session, "Imagine being a Russian soldier after the nazis fell. They were raping every woman. A lot of gang raping too. Shame they didn't have cell phones[.]" Later the same day, the defendant told another user, "I want to kidnap a family. Rape them all in front if [sic] each other. Except for grandma and grandpa[.]" The defendant then sent the user several videos which appear to depict women being raped. The defendant also had on his cell phone a 14-second video depicting the forcible sodomy of a crying infant, strapped into a car seat.

---

[4] Snuff refers to rape and murder.

On March 1, 2026, the defendant and another user traded messages and videos depicting rape. The defendant sent the user multiple videos, to which the user replied, "the crying made me cum I couldn't help it[.]" The defendant responded, "Send me something" "Please" "Some real rape. Young and sexy preferred[.]" The other user then sent a video depicting a seemingly unconscious girl and a man shoving his penis in her mouth. The defendant replied, "she's cute" "[I'd] have to put things in her pussy too[.]"

On February 7, 2026, another user told the defendant he "used to test girls limits to the point of raping them." The defendant responded,

- "That's hot"
- "Ive raped a few back in the day when the definition was different[.]"
- "Im talking about raping dates that wanted me to stop at 2nd base. Fuk that[.]"

On October 22, 2025, the defendant told a user on Session that his "fav is to think id [sic] drilling a big hole in a pretty girls head" "And fuk it[.]" The other user responded, "Her eye socket would probably be enough for me, but drilling is definitely interesting." The defendant said, "I think brain would feel amazing" "Can I beat her while u fuk her eyehole?" "And maybe get a 9y.o. to shove a foot in her ass."

On November 7, 2024, the defendant told a user on Telegram that he wanted to see [redacted] raped. After sending a picture of [redacted], the defendant told the user he had asked her to "gangbang" but she refused. Then he said he "thought about forcing her" and "drugging her" and he "want[s] to see her raped." In another series of messages with a different user, the defendant sent pictures of [redacted] and told the user, "Hurt her" "Choke her out" "Piss on her" and "video it."

### C. The Defendant Exchanged Sexual Messages with Purported Minors

The defendant also engaged in multiple chats on Session with users who purported to be minors. For example, on December 6, 2025, the defendant chatted with a user who told the defendant he was "15m" – i.e., a 15-year-old boy – "looking for someone to feed me and corrupt my young mind[.]" The defendant replied, "Hey. I love to feed[.]"[5] On January 30, 2026, the defendant told a Session user, who purported to be 16 years old, "I want to corrupt you" "16 is age of consent in most places[.]"

On February 7, 2026, the defendant exchanged the following messages with a Session user who told the defendant they were "18-3," i.e., 15 years old.

| | |
|---|---|
| **DEFENDANT** | Preteen is the best |
| **SESSION USER** | It is yes |
| **DEFENDANT** | Maybe u can convince me otherwise |
| **SESSION USER** | Mhm how could i do that |
| **DEFENDANT** | Come over to my place |
| **SESSION USER** | I would love to do that |
| **DEFENDANT** | What will u wear |
| **SESSION USER** | Mhm nothing |
| **DEFENDANT** | Show me |
| **DEFENDANT** | Make me hard |
| **SESSION USER** | U too then ? |
| **DEFENDANT** | Sure |
| **SESSION USER** | [*sends a picture of what appears to be a girl wearing a bra. The bottom of the girl's breasts is visible in the photo*.] |

[5] Feed in this context refers to sending and receiving sexually explicit pictures or videos.

| | |
|---|---|
| **DEFENDANT** | [*sends three pictures of the defendant, including his face*] |
| **DEFENDANT** | Sexy. Need more |
| **SESSION USER** | I know you do |
| **DEFENDANT** | Come over. Can't promise I'll be gentleman though )) |
| **SESSION USER** | U shouldn't be |
| **DEFENDANT** | So are u gonna help me out w my problem rn? |
| **SESSION USER** | Yes |
| **DEFENDANT** | How u gonna do that if u wont' show more? |
| **DEFENDANT** | Call me and talk dirty? |

### D. The Defendant Claimed he has Sexually Abused Minors

The defendant told users online that he had sexually abused minors in the past, including children as young as 3 years old, and that he had abused children while on travel abroad. For example, on March 1, 2026, the defendant told a user on Session that he wanted to "get 2 teen hookers next time im overseas" and "Bulgaria was amazing!!!" The defendant told the user that "[e]arly teens" was his favorite and he heard "central and s America is sooo easy," though he had "only been to Panama and it wasn't easy[.]" The other user said he "suspect[s] nowhere is 'easy' and 'safe.'" The defendant responded, "Bulgaria was easy." In October 2022, the defendant traveled to Bulgaria for work.

The defendant told other users online that he had previously sexually abused a 13-year-old family member and wanted to sexually abuse an 8-year-old child whom he occasionally babysits. On November 23, 2025, the defendant told a Session user that his favorite age is "11" and when asked, "Have you ever had one," the defendant replied with his shorthand for "yes."

The other user asked how old she was, and the defendant said, "11, ofc." On February 7, 2026, the defendant told another user that he had received oral sex from a 3-year-old, and he had "fuked several under 12. The best[.]"

## II. Procedural History

On April 30, 2026, a criminal complaint and arrest warrant were issued charging the defendant with distribution of CSAM, in violation of 18 U.S.C. § 2252(a)(2) & (b)(1). Dkt. 1. The defendant was arrested, and on May 4, 2026, he made his initial appearance in the Eastern District of Virginia.

On May 28, 2026, a grand jury in the Eastern District of Virginia returned a six-count Indictment charging the defendant with two counts of advisement for CSAM, in violation of 18 U.S.C. § 2251(d), and one count each of transportation, distribution, receipt, and possession of CSAM. On August 4, 2026, pursuant to a plea agreement, the defendant entered guilty pleas to Counts 2 and 6 of the Indictment, charging him with advertisement and possession of CSAM, respectively. A sentencing hearing was scheduled for November 17, 2026. The defendant has been detained since his arrest in May 2026.

# SENTENCING ANALYSIS

## I. Statutory Penalties and Guidelines Calculations

To determine an appropriate sentence, "[a] district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines." *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). Next, "the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in § 3553(a) before imposing the sentence." *Id*. Those factors include the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence to promote respect

for the law, provide just punishment, deter criminal conduct, protect the public, and avoid unwarranted sentencing disparities. *See* 18 U.S.C. § 3553(a).

Although the guidelines are advisory and are only one of the factors listed in § 3553(a), they assist the Court by "provid[ing] certainty and fairness in meeting the purposes of sentencing, [while] avoiding unwarranted sentencing disparities." *United States v. Booker*, 543 U.S. 200, 264 (2005) (internal quotation marks and citations omitted). Indeed, in the ordinary case, there will be a significant amount of overlap between the guidelines range and the remaining § 3553(a) factors, because the guidelines "reflect a rough approximation that might achieve § 3553(a)'s objectives." *Rita v. United States*, 551 U.S. 338, 350 (2007). Thus, although the guidelines are not mandatory, they remain "the starting point and the initial benchmark" in ensuring fair and just sentencing both for defendants, individually, and across multiple cases, collectively. *Gall v. United States*, 552 U.S. 38, 49 (2007). Ultimately, the sentence imposed must meet a standard of reasonableness. *See Booker*, 543 U.S. at 260-61.

The U.S. Probation Office prepared a PSR containing the defendant's Guidelines calculation. As explained in the PSR, the adjusted offense level, plus the acceptance of responsibility credits, result in a total offense level of 37. The defendant has a criminal history score of zero. Accordingly, his Guidelines range is 210 – 262 months. PSR ¶¶ 122-123. Neither party has objected to the Guidelines calculation.

**II. Section 3553(a) Factors**

The United States believes that a sentence of 262 months' imprisonment and a lifetime term of supervised release is sufficient but not greater than necessary to reflect the totality of the defendant's conduct and comport with the purposes of sentencing set forth in 18 U.S.C. § 3553.

**A. The nature, circumstances, and seriousness of the defendant's offense.**

The defendant's conduct is abhorrent. The defendant – a career employee of the FBI – trafficked vile depictions of child sexual abuse online and harbored elaborate fantasies regarding the rape and murder of women and girls. He frequently trafficked these images and videos in group chats with hundreds of participants, who, like the defendant, wanted to share CSAM, discuss their interests, and indulge their fantasies about the sexual abuse of children. The Sentencing Commission has recognized that child pornography "communities" are far more dangerous places than other faceless forums where individuals can simply exchange and download child pornography. In fact, in its 2012 Report to Congress, the Sentencing Commission correctly noted that such communities are dangerous in part because their existence "increases the likelihood that *other* community members may engage in sex offending to create new child pornography images for trading online." United States Sentencing Commission, *2012 Report to the Congress: Federal Child Pornography Offenses*, at 94 (December 2012) ("2012 Report") (emphasis in original). They also normalize the sexual exploitation of children, help offenders look at their deviant sexual desires in a positive light, and could possibly lead offenders to progressing from viewing CSAM to committing other sex offenses. *Id.* at 94-98.

Indeed, the defendant enthusiastically posted images and videos depicting child rape, abuse, and exploitation in these group chats. For example, on November 23, 2025, the defendant stated in a 500+ participant group that he wanted to "kidnap a family" and "[r]ape them all in front if [sic] each other." He then posted a series of videos depicting the violent sexual assault of women and girls. One video, which has an MD5 ending in "8562eabc," shows a man vaginally penetrate a gagged and blindfolded pubescent girl. The girl's hands are pinned underneath her body, and she can be heard yelling during the video. In another video, which has an MD5

ending in "6d5bed," two men are shown sexually assaulting a young girl on a bed. One man is penetrating the girl's vagina with his penis while the second man is putting his penis in the girl's mouth. At one point the first man slaps the girl and puts his hands around her neck while he penetrates her. The girl can be heard making sounds of distress throughout the video.

Through his conduct, the defendant whetted the appetites of other pedophiles online who were eager to exchange CSAM and talk about their vile sexual fantasies. Ultimately, the chats excerpted in the PSR and included in this memorandum provide just a brief glimpse of the defendant's involvement in these group chats and his CSAM trafficking, which spanned multiple years and thousands of messages. The chats reveal not just the defendant's criminal offenses but also his complete indifference to the children who were sexually abused on camera for his sexual gratification.

The harm that the defendant has caused by his conduct is immeasurable. By trafficking in CSAM, the defendant has contributed to the demand for CSAM that fuels the child pornography market and the sexual abuse of children. As the Supreme Court has recognized, trafficking in child pornography is "intrinsically related to the sexual abuse of children in at least two ways." *New York v. Ferber*, 458 U.S. 747, 759 (1982). "First, the materials produced are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation." *Id*. "Second, the distribution network for child pornography must be closed if the production of material which requires the sexual exploitation of children is to be effectively controlled." *Id*.

The impact of CSAM trafficking on victims has long been recognized. *See Osborne v. Ohio*, 495 U.S. 103, 111 (1990) ("The pornography's continued existence causes the child victims continuing harm by haunting the children in years to come."); *United States v. Accardi*,

669 F.3d 340, 345 (D.C. Cir. 2012) ("[C]hild pornography creates an indelible record of the children's participation in a traumatizing activity, and the harm to the child is only exacerbated by the circulation of the materials.").

"Every instance of viewing images of child pornography represents a renewed violation of the privacy of the victims and a repetition of their abuse." Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, § 501(2)(D), 120 Stat. 587, 624 (2006) (codified at 18 U.S.C. § 2251 note); *accord United States v. Sherman*, 268 F.3d 539, 547 (7th Cir. 2001) (citing *Ferber*, 458 U.S. at 759) (recognizing that "[t]he possession, receipt and shipping of child pornography directly victimizes the children portrayed by violating their right to privacy, and in particular violating their individual interest in avoiding the disclosure of personal matters"). These children "must live with the knowledge that adults like [the defendant] can pull out a picture or watch a video that has recorded the abuse of [them] at any time," and they "suffer a direct and primary emotional harm when another person possesses, receives or distributes the material." *Sherman*, 268 F.3d at 547-48.

In this case, the defendant had approximately 5,000 images and videos memorializing the sexual abuse of thousands of children. His CSAM collection was comprised of 256 different known/identified series. Some of those identified victims and their families submitted victim impact statements in this case. The victim impact statements uniformly demonstrate the immense harm and suffering the defendant inflicted on the victims by his actions.

For example, the defendant had 6 images and videos from the SparklingVelvet series, including a 30-second video showing the prepubescent victim ("SV") naked except for panties, on her knees on the bathroom floor while an adult man masturbates and ejaculates on her chest. According to documents filed in support of her restitution request, "[o]ver the course of seven

years, SV was the victim of unyielding sexual abuse perpetrated by her father. Beginning when she was approximately six years old, SV's father repeatedly raped, sodomized, and forced SV to engage in horrific sexual acts. From the outset, SV's biological mother had knowledge of the abuse but did not notify law enforcement or take any action to protect her daughter. As a result, SV's father continued to rape and sexually assault SV throughout her childhood and until his arrest in February 2017. The heinous acts of sexual abuse perpetrated against SV were memorialized by SV's father in thousands of images and hundreds of videos, which he circulated on the dark web." PSR at 203. In her victim impact statement, SV wrote:

> The knowledge that the videos and photos are out there make me so sick and I just think: How can someone be so horrible that they find pleasure in someone else's pain? In MY pain? How can they be drawn to the pornography of a CHILD? Why do I have to be unhappy while some random sicko is out there getting gratification from the most humiliating time of my life? That's more than half of my life on the internet right there. I don't deserve to be this unhappy. I don't deserve to suffer while hundreds, maybe thousands of people are out there satisfying themselves in such a sick manner. I can't express it enough how sick this is and how sick those people are. I wish the depravity would end. The people watching my videos and looking at my photos deserve to be punished for their crimes. Let them all be punished and get what's coming to them.

*Id*. at 213.

The defendant had 10 images and videos from the RCA series. One of the videos, which has an MDG ending in "5FBC1EA," is a compilation video depicting the rape and sexual abuse of numerous very young children, including "Alex." According to the materials submitted in support of her restitution request, "Alex was a young child when the abuse began, perpetrated by a man residing in her household. Her abuser had unfettered access to her, enabling repeated acts of sexual violence. The abuse included anal and vaginal intercourse as well as forced oral copulation and continued for approximately two years before his arrest. Disturbingly, graphic

images documenting these crimes have been disseminated globally." *Id*. at 137. In her victim impact statement, Alex wrote:

> When I think about what my life could be like if only the burden of what happened was not still ongoing, I know I would be someone completely different. I might have acted in movies or put out many music albums. I could have become a famous fashion designer by now. I would have gone to college or joined community groups that would help me. Or I would at least have the bare minimum of a stable life where I can ride the bus and walk down the sidewalk happily. I could live with peace of mind. But these dreams feel out of reach. I do not know if there will ever be a time when I can safely pursue them. I am afraid I will be rotting on the fringes of society forever. And I am sure the people who do this stuff are probably overjoyed by that. They feed on ruined lives. They would love to watch everyone like me die a slow, horrific death. But I so strongly hope that I can find the ability and resources to survive. That I can thrive despite everything and prove them wrong.

*Id*. at 148.

The defendant had 1 image from the MotorCouch1 series depicting the victim "Cara." According to materials submitted in support of her restitution request, "Cara was sexually abused when she was a young girl. Her abuser raped, sodomized, and forced her to perform oral copulation. Cara was aware of the abuse but does not remember all the details. Her abuser drugged her and laced her drink with alcohol. While she was aware of some of the abuse, she did not know the full extent until the images and videos were circulated online." PSR at 111. In her victim impact statement, Cara wrote:

> What happened to me as a kid and what continues to happen now with my online exploitation has caused my whole life to be a mess. I do have feelings of being worthless and being not good enough. I want to be alone; I don't want to be with anyone. I feel like anyone would be better without it.

The defendant had 32 images and videos from the PurpleCheer series, two of which he distributed to other offenders online. In one of the videos the defendant distributed, the victim, "Posey," is shown sitting on the floor of her closet, removing all of her clothing, and then masturbating with a hairbrush. According to the materials submitted in support of her restitution

request, Posey was the victim of online sextortion, the aftermath of which "contains to affect Posey and her family." *Id.* at 128. "Posey's name is now associated with sexual acts rather than her accomplishments. Posey faces harassment in public from peers who believe she willingly participated in the production of her CSAM. For example, a student from her school confronted Posey while she was seated at a restaurant and berated her for having her images on the internet, while the entire restaurant stared at her. Mortified, Posey began to cry and left feeling humiliated." *Id.* In her victim impact statement, Posey's mother writes:

> My daughter didn't give her innocence away, it was stolen from her by predators. She is a child, she did not have consent to give. She has been reduced from a human being into a sexual object, abused, and made to be sold again, and again, and again. She no longer controls the narrative of her life, but has been dictated by the disgustingly immoral perpetrators who profit off of it.

*Id*.

The defendant had 3 videos from the PigtailsScrunchies series, including a 10-second video showing the victim, "Sage," completely nude and exposing her genitals to the camera. According to materials submitted in support of her restitution request, "[t]he PigtailsScrunchies series is a newly identified series." PSR at 192. "A stranger contacted her through Snapchat and gradually gained her trust. Their initial interactions seemed harmless. He was kind and attentive, saying the things a vulnerable pre-teen wants to hear. Over time, they began communicating daily. As the relationship progressed, he asked Sage to send images of parts of her body and began grooming her through exposure to pornography. He then escalated to threats, telling her he would inform her parents if she did not comply with his demands. Sage was also terrified he might carry out his threats and visit her, as he repeatedly told her he would come to see her." *Id*. Until recently, Sage and her family believed "that the CSAM depicting Sage might not have been circulated" online. *Id*. "Sage and her family are now confronting the reality that the images are

in circulation. This is new and frightening territory, particularly because Sage's real name and the school she attends have also been disclosed online. Concerned about potential stalking and other threats, the family has strengthened home security. Each new instance in which CSAM depicting Sage is circulated confirms that her parents have lost any meaningful control to protect Sage." *Id*.

The defendant had 223 images and videos from the Tara series, several of which he distributed to other offenders online. In one of the videos, which is over 6 minutes long, the prepubescent victim, "Sloane," is depicted naked with a mask on her face while an adult man penetrates her vagina with his penis. Halfway through the video, the man is shown inserting an object in Sloane's vagina. After the defendant received this video on March 3, 2026, he told the other user it was "[h]ot" but "not rough[.]" The defendant told the user he loved "degradation," was looking for "[m]ore rough" and he thought perhaps "the rape" he had seen online might be "staged" and "it's better if they aren't asking for it[.]"

According to material submitted in support of her restitution request, "Sloane was between the ages of five and nine at the time she was abused. Law enforcement estimates the abuse took place over a five (5) year period. Over that time the abuse and the images became increasingly aggressive and physically violent. Sloane's Law Enforcement Point of Contact for her series has described the series as 'an extremely graphic series of photos and videos of a young girl being violently sexually assaulted . . . The series became increasingly violent over [the last] 2 years, with the latest images showing the man depicted wielding a large knife toward the victim' against her genitals as well as her face and neck. In some of the images, both the perpetrator and the victim are wearing clown or Mardi Gras type masks." In her victim impact statement, Sloane wrote:

> Every time someone views this trash, he is once again making me re-live the most horrific part of my childhood. I can never truly heal because the perpetrators and stalkers never allow me to do so. Anyone viewing these videos/pictures is just as guilty for causing me or any other exploited child undue harm, unneeded stress and insecurity in a time when we need to feel safe and have a chance to heal/recover. As a young adult, I now realize the extent of people looking at these and I'm concerned about their locations fearing that they will find me. These people need to be punished for taking away a major part of my childhood and sense of security.

The nature and seriousness of the defendant's crimes weigh in favor of a sentence of 262 months.

**B. The Defendant's History and Characteristics**

According to the defendant, he was raised primarily by his father and stepmother, who was emotionally abusive toward the defendant at a young age. PSR at 21. [redacted]

Despite a challenging childhood, the defendant reported that he had the good fortune to attend college, where he earned two bachelor's degrees, and graduate school where he earned his PhD in microbiology. He married his wife, to whom he is still married, and had a child with her. And he had steady employment since completing school, including nearly two decades of federal service – 4 years with the Department of Agriculture and 15 years with the FBI.

Despite the defendant's education, family support, and financial resources, he chose—repeatedly—to victimize children. Worse still, the defendant, more so than most in his position, *knew better*. He was a career federal worker with a security clearance who rose up to the position of supervisor in the FBI. The defendant worked on criminal cases during his tenure and understood how crime impacts victims and their families. [redacted]. And yet, the defendant trafficked in vile depictions of child

sexual abuse and posted notices in massive group chats instigating even more circulation of CSAM.

The notion that the challenges faced by the defendant in his youth, [redacted], are a justification or mitigation for his crimes minimizes his own volition and ignores the vast majority of people who, facing similar obstacles, cope without resorting to committing crimes and hurting children. On balance, the defendant's history and characteristics show that he had a stable adulthood with a family, career, and financial means to live a law-abiding life. He chose his path, deeming his sexual gratification worth whatever harm it caused to his victims. His sentence should reflect those facts.

**C. The need for the Sentence Imposed to Afford Adequate Deterrence and Protect the Public**

Both specific and general deterrence call for a significant sentence in this case. With respect to specific deterrence, the risk the defendant poses to children is immense. He collected thousands of images and videos of children being sexually abused and spent considerable time participating in CSAM group chats and ensuring the continued circulation of CSAM. He also engaged in graphic sexual fantasies regarding the sexual abuse of children in his community and the rape and murder of, among others, his family member's minor girlfriend and [redacted]. He also boasted that he had engaged in sex with minors while abroad on work travel and, shortly before his arrest, photographed girls walking to school from inside his FBI-issued vehicle. The defendant knew his conduct was illegal and he knew the consequences if he were caught. He knew that his family would be torn apart, he would lose his job, his security clearance, and any chance at a future in federal service. He also knew, of course, that he would go to jail. But for the defendant, the risk was worth the reward of his sexual gratification and the opportunity to traffic material among like-minded individuals. The defendant even made joking reference to his

job/experience in a November 2025 CSAM group chat. During the chat, one of the users suggested that the dark web application was not safe on phones and it was best to use a "PC[.]" Another user asked what "PC" stood for and the defendant answered jokingly, "Probable cause)))[.]" In September 2024, the defendant asked a user on Telegram if they had "any rape vids[.]" The user said, "u are in office" and defendant replied, "In toilet[.]"

The sentence imposed must protect the public and account for the specific danger the defendant poses to children. No matter his age, if the defendant has access to a phone or a computer he will still be fully capable of committing the same crimes that he committed in this case. In fact, "[s]tudies and reports in this field are consistent with what judicial decisions show: pedophiles who have sexually abused children are a threat to continue doing so, and age does not remove the threat." *United States v. Irey*, 612 F.3d 1160, 1214 (11th Cir. 2010) (citing various studies and reports); *see also United States v. Allison*, 447 F.3d 402, 405–06 (5th Cir. 2006) ("Congress explicitly recognized the high rate of recidivism in convicted sex offenders, especially child sex offenders."). A sentence of 262 months in prison would protect the most vulnerable members of society—namely, children—from the defendant's conduct.

General deterrence, too, is especially important in cases like this one, where the defendant used encrypted messaging applications to traffic CSAM and evaded detection by law enforcement. It is widely reported that the amount of CSAM online is increasing at an alarming pace. *See* Teresa Hyizar, "Child sex abuse content is exploding online. We're losing the fight against it" (available at: https://www.usatoday.com/story/opinion/2023/03/10/how-social-media-emboldensabusers/11413209002/). In 2025 alone, NCMEC reportedly received 21.3 million reports, including 19.5 million reports related to child pornography possession, production, and distribution. *See* NCMEC, 2025 CyberTipline Report (available at:

https://www.missingkids.org/gethelpnow/cybertipline/cybertiplinedata.) And encrypted messaging applications, like the ones the defendant used to traffic CSAM, play a big part in the proliferation of CSAM online. *See* Laura Draper, 2022, "Protecting Children in the Age of End-to-End Encryption" at i (available at: digitalcommons.wcl.american.edu/cgi/viewcontent.cgi?article=1082&context=research) ("Whereas offenders previously needed the technical know-how to access the dark web in order to find and trade child sexual abuse material (CSAM), they can now download to their cell phones any number of free end-to-end encrypted messaging apps, which provide the same level of security and privacy as the dark web. This greatly reduces the risk to the offender when sharing such material."); *id*. at 5 ("In end-to-end encrypted environments, [electronic service providers] cannot detect and report CSAM using perceptual hashing techniques. As more and more tech companies implement end-to-end encryption, the volume of reports to NCMEC will likely drop dramatically."); *see also* Coen Teunissen and Sarah Napier, July 2022, "Child Sexual Abuse Material and End-to-End Encryption on Social Media Platforms: An Overview" at 10 (available at: www.aic.gov.au/sites/default/files/2022-07/ti653_csam_and_end-toend_encryption_on_social_media_platforms.pdf) ("end-to-end encryption presents significant challenges to law enforcement officers who investigate CSAM offending [], and limits companies' ability to prevent, detect and report CSAM occurring on their platforms."); Feb. 19, 2019, "Child abuse images being traded via secure apps" (www.bbc.com/news/technology-47279256) (encrypted apps taking over from the dark web as a venue for crime).

The defendant's case is a perfect example of this phenomenon. The defendant's crimes were only detected after he uploaded CSAM to his Google Drive account, which Google detected and reported to NCMEC. Had the defendant confined his activity to Telegram and

Session, which are both end-to-end encrypted platforms, it is highly unlikely that law enforcement would have known about the defendant's offense and intervened when they did.

Distressingly, in addition to the increasing amount of CSAM available, the nature of the CSAM available has also become more depraved in recent years. *See, e.g.*, *U.S. Sent'g Comm'n Hr'g on the Child Pornography Guidelines* 1-2 (Feb. 15, 2012) (statement of James M. Fottrell, Steve DeBrota & Francey Hakes, Dep't of Justice) (available at http://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-andmeetings/20120215/Testimony_15_Hakes_DeBrota_Fottrell.pdf) ("[I]nfants and toddlers are now regularly victimized by child pornography offenders and the victims are forced into more brutal and degrading sexual activity"). That depravity is evident here. The need for effective deterrence through a significant sentence is therefore essential. As the Supreme Court has reasoned, "[t]he most expeditious if not the only practical method of law enforcement [to halt the exploitation of children] may be to dry up the market for [child pornography] by imposing severe criminal penalties on persons selling, advertising, or otherwise promoting the product." *Ferber*, 458 U.S. at 747. A sentence of 262 months in prison would accomplish that aim.

## III. Supervised Release

The Court must also determine the appropriate term of supervised release at sentencing. "Supervised release … is not a punishment in lieu of incarceration." *United States v. Granderson*, 511 U.S. 39, 50 (1994). Instead, it "fulfills rehabilitative ends, distinct from those served by incarceration." *United States v. Johnson*, 529 U.S. 53, 59 (2000). Under 18 U.S.C. § 3583(k), the authorized term of supervised release for the defendant's crimes is at least five years and up to life. This five-year mandatory minimum term reflects a heightened concern for recidivism among sex offenders and the need for supervision over time. *See* H.R. Rep. No. 107–

527 at 2 (2002) (explaining that “studies have shown that sex offenders are four times more likely than other violent criminals to recommit their crimes” and that “the recidivism rates do not appreciably decline as offenders age”); H.R. Conf. Rep. No. 108-66 at 49–50 (2003). Notably, the Guidelines recommend a lifetime term of supervised release for sex offenders, U.S.S.G. § 5D1.2(b) (Policy Statement), which courts have observed “reflects the judgment of Congress and the Sentencing Commission that a lifetime term of supervised release is appropriate for sex offenders in order to protect the public.” *United States v. Morace*, 594 F.3d 340, 351 (4th Cir. 2010) (quotation marks and citation omitted).

Based on an assessment of these factors, the United States recommends that the Court impose a lifetime of supervised release with the conditions of supervision described in 18 U.S.C. § 3583(d) for felons required to register under the Sex Offender Registration and Notification Act and those described in U.S.S.G. § 5D1.3(d)(7) for sex offenders. Given the length of time the defendant engaged in the offense conduct and the seriousness of his crimes, a lifetime term of supervision is appropriate to limit his capacity to reoffend and provide him with steady access to the treatment and monitoring he clearly requires.

## IV. Special Assessments Under the Justice for Victims of Trafficking Act (JVTA) & the Amy, Vicky, and Andy Child Pornography Victim Assistance Act (AVAA)

On December 7, 2018, Congress enacted the Amy, Vicky, and Andy Child Pornography Victim Assistance Act. The Act instructs that, in addition to any restitution or other special assessment, courts “shall assess . . . not more than $35,000 on any person convicted of any [] offense for trafficking in child pornography.” 18 U.S.C. §§ 2259A(a)(2). Assessments collected under this statute are deposited in the Child Pornography Victims Reserve, which provides monetary assistance to victims of trafficking in child pornography, *see* §§ 2259(d) & 2259B, and shall be paid in full after any special assessment under § 3013 and any restitution to victims of

the defendant's offenses, *see* § 2259A(d)(2). In determining the amount to be assessed under § 2259A, courts should consider the sentencing factors set forth in § 3553(a) and the guidance in § 3572 for the imposition of fines. § 2259A(c). The United States respectfully requests that the Court impose a reasonable special assessment under § 2259A, in addition to the mandatory special assessment for his felony convictions pursuant to 18 U.S.C. § 3013.

Additionally, under the Justice for Victims of Trafficking Act ("JVTA"), courts "shall assess an amount of $5,000 on any non-indigent person" convicted of certain enumerated offenses, including advertisement and possession of CSAM. *See* 18 U.S.C. § 3014. Based on the information contained in the PSR, the defendant is non-indigent. Accordingly, the government respectfully requests that the Court impose an assessment of $5,000, per count of conviction, pursuant to 18 U.S.C. § 3014.

## V. Restitution

Restitution is mandatory in this case, and the court is bound to order a restitution amount that reflects the defendant's relative role in the causal process that underlies each victim's losses, but which is not less than $3,000. 18 U.S.C. § 2259(a), (b)(2)(B). The amount of restitution ordered to a victim should not turn on the economic circumstances of the defendant. *Id.* § 2259(b)(4)(B)(i).

According to the PSR, the following victims have submitted restitution requests to date, and in the following amounts:

| **Series** | **No. of Images/Videos Possessed by Defendant** | **Restitution Request** |
|---|---|---|
| Aprilblonde (April) | 37 | $10,000 |
| Best Necklace (Maria) | 7 | $10,000 |

| | | |
|---|---|---|
| BluePillow1 (Henley) | 2 | $5,000 |
| Braid&Tile (Audrey) | 11 | $3,000 |
| JBN Flowers1 (Julie) | 3 | $10,000 |
| JBN Flowers2 (Ivy) | 1 | $10,000 |
| Lexie (Aster) | 2 | $10,000 |
| MotorCouch1 (Cara) | 1 | $8,000 |
| PurpleCheer (Posey) | 32 | $8,000 |
| RCA (Alex) | 10 | $10,000 |
| SparklingVelvet (SV) | 6 | $7,500 |
| Sweet Pink Sugar (Mya) | 3 | $5,000 |
| Sweet White Sugar (Pia) | 12 | $7,500 |
| Tara (Sloane) | 223 | $10,000 |
| Vicky (Lily) | 8 | $10,000 |
| ZooFamily1 (Ali) | 2 | $3,000 |
| Flower Lights (Layla) | 17 | $3,000 |
| HG1 (Eliza) | 3 | $3,000 |
| PigtailsScrunchies (Sage) | 3 | $8,000 |

Based on the materials provided in support of the above restitution requests, the government requests the Court enter an order of restitution in the amounts requested by the victims.

**VI. Forfeiture**

A consent order of forfeiture was entered at the defendant's guilty plea hearing.

**CONCLUSION**

For the reasons stated herein, and such others as the United States may raise at sentencing, the United States requests that this Court sentence the defendant to 262 months' imprisonment and a lifetime of supervised release.

Respectfully submitted,

Date: November 10, 2026

By: /s/

Lauren Halper
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3700
Fax: (703) 299-3980
Email: Lauren.Halper@usdoj.gov